Filed 6/5/26  In re K.C. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.C. et al., Persons Coming Under the Juvenile Court Law. | B345186 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>T.J.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. Nos. 22CCJP00042A, 22CCJP00042B, 22CCJP00042C |

APPEAL from an order of the Superior Court of Los Angeles County, Ashley Price, Judge.  Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Bryan Mercke, Deputy County Counsel, for Plaintiff and Respondent.

Mother challenges the adequacy of notices the Los Angeles County Department of Children and Family Services (Department) sent to the Bureau of Indian Affairs (BIA) and specific tribes in connection with her children's dependency cases. She contends the Department's failure to comply with the federal Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) and related California law (Welf. & Inst. Code, § 224 et seq.) requires reversal of the juvenile court's ICWA findings and remand with instructions regarding the notices.[1]  We conclude the evidence supports the court's ICWA findings and formal notice was not required.  We affirm.

**BACKGROUND**

The sole issue raised in Mother's appeal is ICWA compliance.  We therefore focus on the facts bearing on this issue.

Mother has three boys:  K.C. (born December 2019); S.B. (born February 2022); and R.B. (born November 2022).  A.P. (Father P.) is K.C.'s presumed father.  Ri.B. (Father B.) is the presumed father of S.B. and R.B.

The Department filed dependency petitions, alleging Mother and Father B. had a history of domestic violence that endangered the children.  A later petition added allegations that Mother neglected the children.  The juvenile court sustained the petitions and declared the children dependents.

1.    *Initial ICWA Inquiries*

Mother and Father B. each filed ICWA-020 forms for S.B. and R.B. stating the children had no known Indian ancestry. At the initial detention hearing for S.B., the court reviewed the

---

[1]    State statutory references are to the Welfare and Institutions Code.

2

parents' ICWA-020 forms and found there was no reason to know S.B. was an Indian child.  At an early hearing for R.B., the court asked Father B. about the child's possible Indian status.  Father B. denied any Indian ancestry.  Based on the parents' ICWA-020 forms and the inquiry of Father B., the court found there was no reason to know R.B. was an Indian child.

As for K.C., Mother filed an ICWA-020 form stating the child has no known Indian ancestry.  At the initial detention hearing, the juvenile court reviewed the form and found ICWA did not apply to K.C. through Mother.  The court also found Father P.—whose whereabouts were unknown—to be K.C.'s alleged father.  After the Department completed its due diligence without locating Father P., the court made an initial finding that it had no information to believe ICWA applied to K.C. through Father P.

## 2.  *Maternal Relatives*

In December 2022, the Department made further inquiry of Mother, who reported that her mother (the maternal grandmother) had told her that her father (the maternal grandfather) "is Puerto Rican, Italian and [American] Indian." According to the Department's report, Mother denied "knowing her father's name, any familial information or any specific tribal information."  Mother said she "does not speak with" the maternal grandmother, who Mother believed was "incarcerated somewhere in either Indiana or Georgia."  Mother also said the maternal grandmother was "unwilling to provide information" about the maternal grandfather, as she "becomes offended" whenever Mother asks about him.  Mother could not identify any other relatives who might have information regarding ICWA.

In March 2023, the Department spoke with a maternal great aunt and maternal great grandmother. The great aunt reported the children's great-great-great-grandmother was "full Native" and their great-great-grandmother was "partially Native and Black," but she was unable to identify a "connected Native tribe." The maternal great grandmother said the family had "Native features but we are not connected to a tribe or anything like that," and she also was unable to identify a connected tribe. The Department's reports do not say whether the social worker asked either relative about mother's claim that the maternal grandfather might have Indian heritage.

In April 2024, Mother again reported she "may have" Indian ancestry; however, she could not identify a tribe or provide further information. She made a similar report in October 2024, but noted she had been a foster child and did not really know her heritage.[2]

### 3.  *S.B.'s and R.B.'s Paternal Relatives (Father B.)*

In October 2024, the Department contacted S.B.'s and R.B.'s paternal grandmother, who reported she had no knowledge of Indian heritage in the family. At a hearing in November 2024, the juvenile court inquired of the children's paternal aunt and again of the paternal grandmother, both of whom denied Indian ancestry.

### 4.  *K.C.'s Paternal Relatives (Father P.)*

Father P.'s whereabouts remained unknown until 2023. In July 2023, the Department received a call from Father P.'s

---

[2]  The Department also asked the children's caregivers whether they had heard the children's parents or relatives discuss Indian heritage. None had heard anything relevant.

mother (K.C.'s paternal grandmother), who reported her son was incarcerated (she did not know where exactly). The paternal grandmother said she spoke to Father P. daily and she wanted to establish paternity on his behalf. A social worker advised her that she would need to contact K.C.'s counsel about a DNA test. The social worker did not inquire about ICWA. A DNA test later confirmed that Father P. is K.C.'s biological father.

In August 2023, the Department received a call from Father P. He reported he was incarcerated in a state prison substance abuse treatment facility and asked that his mother be given physical custody of K.C. because he did not want the child "adopted out." He also identified his sisters—paternal aunts Ashley P. and Porsha T.—as possible caregivers. The social worker did not inquire about ICWA. The record does not include an ICWA-020 form for Father P., nor is there an ICWA-010 form to confirm the Department made its initial ICWA inquiry of him.

In November 2023, the Department called the paternal grandmother and paternal aunt Ashley P. about K.C.'s possible placement. The social worker did not inquire about ICWA on either call.

In February 2024, the Department received another call from Father P. The social worker provided him with details about K.C.'s dependency case and upcoming hearing dates, but did not inquire about ICWA.

In April 2024, Father P. appeared at a progress hearing for K.C. and testified regarding paternity issues. The court found Father P. was K.C.'s presumed father. The court did not inquire about ICWA.

Later the same month, the Department had another call with Father P. about K.C.'s placement. Father P. again asked the Department to reach out to the maternal grandmother or the maternal aunts about the child's placement. The social worker did not inquire about ICWA.[3]

In October 2024, paternal aunt Porsha T. reported the family had "Chiasaw [*sic*] and Choctaw" heritage. At a permanency planning hearing the next month, the juvenile court ordered the Department to investigate the paternal aunt's claim, conduct further ICWA inquiry of other relatives, prepare a report of "who was interviewed, dates and places of birth of the relatives as far back as can be ascertained," and provide notice to the BIA and any "appropriate tribes if necessary." Although Father P. was present at the hearing, the court did not ask him about ICWA.

The Department spoke again with paternal aunt Porsha T. She said she "believed" the family had Native American heritage, but she did not have direct knowledge about it, and she would have to " 'consult with her elders.' " She could not confirm the family's ancestry with the Chickasaw or Choctaw tribes and she did not know if the family "had any tribal membership, is eligible for tribal membership or resided on a tribe [*sic*] or reservation." Porsha T. declined to provide names or contact information for other family members who might know more, stating she was K.C.'s only paternal relative "involved with the case."

---

[3] The Department contacted the paternal aunt Ashley P. later that day. A few days later the Department contacted the paternal grandmother. The Department did not inquire about ICWA during either conversation.

The Department made at least two subsequent attempts to follow up with Porsha T. but received no response.

In November 2024, the Department filed its report on the agency's ICWA inquiry. With respect to K.C., the report showed paternal aunt Porsha T. was the only relative the Department had attempted to interview about the child's possible Indian heritage. The Department pledged to "continue to inquire about Native American heritage and continue to attempt to engage [Porsha T.]," but reported there was "no additional information" to establish a " 'reason to know' that ICWA applies to this matter." After receiving the report, the juvenile court continued the permanency planning hearing and set a March 2025 hearing for further ICWA inquiry.

In January 2025, the Department sent ICWA-030 notices to the BIA, the Chickasaw Nation, the Mississippi Band of Choctaw Indians, the Choctaw Nation of Oklahoma, and the Jena Band of Choctaw Indians. The notices listed Mother's and Father P.'s names and birthdates, but provided no information about K.C.'s paternal grandmother or any other relatives.

Three tribes responded. The Jena Band of Choctaw Indians stated K.C. and his parents were not members and not eligible for membership. The Choctaw Nation of Oklahoma stated the individuals listed were not members and were not eligible for enrollment. The Mississippi Band of Choctaw Indians similarly stated K.C. and his parents were not enrolled members and were not eligible for enrollment. The Choctaw Nation of Oklahoma's responses included the express qualification that the tribe's determination was "based solely on the information that you provided" and, "[i]f a name and date of birth was not

provided, we could not research that family member." (Boldface omitted.)

In advance of the March 2025 hearing, the Department filed an updated ICWA report regarding the tribes' responses and requested a 90-day continuance to conduct further ICWA investigation. The juvenile court continued the hearing to April 24, 2025, noting, "ICWA notices remain pending."

On March 25, 2025, Mother filed this appeal.[4]

## DISCUSSION

### 1. *Governing Law*

ICWA and related California law define an " 'Indian child' " as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (b).) In addition to imposing substantive requirements for the placement of an Indian child and the termination of parental rights, ICWA gives Indian tribes the right to intervene in state court proceedings contemplating such actions. (25 U.S.C. § 1911(c).)

Under our state law, "courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child' in dependency cases." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125 (*Dezi C.*), quoting § 224.2, subd. (a).) "Child welfare agencies discharge

---

[4] Mother noticed her appeal from a March 4, 2025 order denying her petition for modification without an evidentiary hearing. (See § 388.) Her briefing, however, is directed exclusively at the adequacy of the ICWA notices and makes no argument that the juvenile court erred with respect to the modification petition.

8

this state law duty by 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' " (*Dezi C.,* at p. 1125, quoting § 224.2, subd. (b).) "[F]urther inquiry" is required if there is "reason to believe" the child is an Indian child (§ 224.2, subd. (e)), and formal notice to the relevant tribes is required if there is "reason to know" the child is an Indian child (§ 224.3, subd. (a)).

A "reason to know" exists under any of the following circumstances: "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child. [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village . . . . [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child. [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child. [¶] (5) The court is informed that the child is or has been a ward of a tribal court. [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d).)

We review the juvenile court's finding as to whether there is reason to know a minor is an Indian child for substantial

9

evidence.  (See *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101;
cf. *Dezi C., supra,* 16 Cal.5th at p. 1141.)

**2.      *Formal Notice Was Not Required***

Mother challenges the adequacy of the ICWA-030 notices
the Department sent to the tribes in connection with K.C.'s case.
She contends the notices were defective because they omitted
information about Mother's relatives—specifically the maternal
grandmother and maternal great aunt Ruth H.—and because
they omitted information about K.C.'s paternal grandmother.
Because the notices were defective in mother's telling, she
maintains the ICWA findings as to all three children must
be reversed and the matter remanded for proper re-noticing.
We disagree.  Because the evidence was insufficient to compel
a finding that there was "reason to know" any of the children
was an Indian child, formal notice was not required.  (§ 224.3,
subd. (a); see *In re P.H., Jr.* (2024) 98 Cal.App.5th 992, 997–998
(*P.H.*).)

*P.H.* is instructive.  In that case, the parents filed
ICWA-020 forms, with the father indicating possible affiliation
with the " 'Yucca Indian or Navajo' " tribes, and the mother
indicated the child's maternal great-great-grandmother was
" 'possible Apache' " and that another maternal relative was
" 'possible Yuki.' " (*P.H., supra,* 98 Cal.App.5th at p. 994.)  The
Department investigated by speaking with the child's paternal
grandmother, who denied any Indian ancestry and explained
that the paternal grandfather's family was Irish.  (*Id.* at p. 995.)
The father himself conceded he did not know why he believed he
had Indian ancestry, explaining that as a child he had watched
western movies with his grandparents and " 'maybe it was all the
folklore.' " (*Ibid.*)  On the maternal side, a maternal great-aunt

10

told the Department she had " 'no way of proving that her family had any Yaki heritage' " and the child's great-grandmother had never claimed Indian ancestry.[5] (*Id.* at p. 994.) The Department nonetheless sent ICWA-030 notices to several Apache and Navajo tribes. (*Id.* at p. 995.) On appeal, the father challenged the adequacy of those notices, arguing they were defective in various respects. (*Id.* at pp. 995–997.)

The *P.H.* court rejected the father's challenge. The court explained formal notice to tribes is required only where there is " 'reason to know' " a child is an Indian child, as defined by the six circumstances set forth in section 224.2, subdivision (d), and none of those circumstances had been established by the Department's investigation. (*P.H., supra,* 98 Cal.App.5th at pp. 996–997.) At most, the statements by the parents and their relatives suggested the child might have some Indian ancestry —but, as the reviewing court observed, " 'tribal ancestry is not among the criteria for having a reason to know the child is an Indian child.' " (*Id.* at p. 997, accord *In re D.F.* (2020) 55 Cal.App.5th 558, 571 (*D.F.*) ["A suggestion of Indian ancestry is not sufficient under ICWA or related California law to trigger the notice requirement."].) Because the predicate for formal notice was not established, the father's arguments about the adequacy of the notices the Department voluntarily sent were beside the point. (*P.H.*, at pp. 997–998.)

As in *P.H.*, there is no need here to distinguish between the "reason to believe" standard that triggers further inquiry and

---

[5] The reference to "Yaki" heritage may have been a misspelling of "Yaqui." (*P.H., supra,* 98 Cal.App.5th at p. 997, fn. 5.)

11

the "reason to know" standard that triggers formal notice, because Mother challenges only compliance with the notice requirement.[6] (See *P.H., supra,* 98 Cal.App.5th at p. 996.) The only question presented is whether anything in the record establishes reason to know that any of the three children is an Indian child under any of the six circumstances listed in section 224.2, subdivision (d). Nothing does.

With respect to S.B. and R.B., both Mother and Father B. denied Indian ancestry at the outset of the proceedings, and the juvenile court found no reason to know either child was an Indian child. The Department's subsequent ICWA inquiry yielded only vague and unverifiable suggestions of possible ancestry. Mother told the Department she "may" have Indian ancestry but could not identify a tribe or provide contact information for anyone

---

[6] There do, however, appear to be gaps in the Department's investigation that may affect the duty of further inquiry. The most apparent are the agency's seeming failure to obtain an ICWA-020 declaration from Father P. and the juvenile court's failure to ask him on the record whether K.C. may be an Indian child. (See § 224.2, subd. (c).) The Department also appears to have failed to ask K.C.'s paternal grandmother and paternal aunt Ashley P. whether K.C. may be an Indian child and whether either of them knows of other relatives who may have relevant information under ICWA. (See § 224.2, subd. (b).) Because the Department's inquiry is ongoing as of the date of Mother's appeal, we can make no judgment on this record about the ultimate adequacy of the inquiry. (See, e.g., *J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, 460–461 [challenge to ICWA inquiry was not ripe where case was "still ongoing" and "any perceived deficiencies with ICWA inquiry and noticing may still be resolved during the normal course of the ongoing dependency proceedings"].)

who might have more information.  Maternal great aunt Ruth H. reported the family's great-great-great-grandmother was "full Native" and a great-great-grandmother was "partially Native and Black," but she was unable to identify a connected tribe. The maternal great grandmother told the Department the family had "Native features" but was "not connected to a tribe or anything like that," and she likewise could not identify a tribe. The paternal grandmother and paternal aunt of S.B. and R.B. both denied Indian ancestry.

None of this constitutes reason to know S.B. or R.B. is an Indian child under section 224.2, subdivision (d).  At most, these statements suggest that some distant ancestor may have had Native heritage—but " 'tribal ancestry is not among the criteria for having a reason to know the child is an Indian child.' " (*P.H., supra,* 98 Cal.App.5th at p. 997.)  Because an Indian child must be either a "member of an Indian tribe" or "eligible for membership in an Indian tribe and . . . the biological child of a member of an Indian tribe" (25 U.S.C. § 1903(4); § 224.1, subd. (b)), the suggestion of possible Indian ancestry, untethered to any identified tribe or to any claim of tribal membership or eligibility for membership, does not trigger the formal notice requirement.  (See §§ 224.2, subd. (d), 224.3, subd. (a); *D.F., supra,* 55 Cal.App.5th at p. 571.)

The analysis is no different for K.C.  Paternal aunt Porsha T.'s initial message stating the family had "Chiasaw [*sic*] and Choctaw" heritage was, at most, a suggestion of possible tribal ancestry.  When the Department followed up, the paternal aunt could not confirm any ancestry with the Chickasaw or Choctaw tribes, said she would need to consult with her elders, declined to provide contact information for other relatives, and

13

never returned the Department's calls, despite saying she would. This sort of unverified and unspecific suggestion of Indian ancestry does not rise to the level of reason to know a child is an Indian child under the criteria listed in section 224.2, subdivision (d). (See *P.H., supra,* 98 Cal.App.5th at pp. 996–997.)

Mother nonetheless argues the ICWA-030 notices the Department sent to the Chickasaw and Choctaw tribes were defective for omitting information about the maternal relatives and about K.C.'s paternal grandmother. But Mother's argument presupposes that formal notice was required. It was not. The juvenile court never found there was reason to know K.C. was an Indian child—it merely ordered the Department to notice appropriate tribes "if necessary." The Department sent notices while its inquiry remained ongoing—not because the threshold for mandatory notice had been met, but as a step in its continuing inquiry. Because no formal notice was required in the first instance, the content of the notices cannot establish prejudicial error. (See *P.H., supra,* 98 Cal.App.5th at pp. 997–998 [rejecting challenge to adequacy of notices where formal notice was not required because there was no reason to know the child was an Indian child].)

Finally, because formal notice was not required for any of the three children, Mother's argument that the content of the notices for K.C. requires reversal of the ICWA findings for S.B. and R.B. necessarily fails. Should the Department's ongoing inquiry into K.C.'s paternal ancestry yield information that provides reason to know K.C. is an Indian child, the Department remains obligated to provide appropriate notice at that time. (See fn. 6, *ante.*)

14

## DISPOSITION

The order is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, Acting P. J.

We concur:

ADAMS, J.

HANASONO, J.

15